**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| Christopher Blake Brown, Michael Beard, Global Weather Productions, LLC, Aaron Rigsby, BJLP WX Productions LLC, Max Olson, Brett Adair, | § | Case No: 1:26-cv-66 |
| Plaintiffs, | § | CLASS ACTION |
| v. | § | |
| Meta Platforms, Inc., d/b/a Facebook and d/b/a Instagram, | § | JURY TRIAL DEMAND |
| Defendant. | § | |

SIG SANDERS · LAW GROUP ·

## COMPLAINT

Plaintiffs Christopher Blake Brown ("*Brown*"), Michael Beard ("*Beard*"), Global Weather Productions, LLC ("*GWP*"), Aaron Rigsby ("*Rigsby*"), BJLP WX Productions LLC ("*BJLP*"), Max Olson ("*Olson*"), and Brett Adair ("*Adair*") (collectively referred to herein as "*Plaintiffs*"), by and through their undersigned counsel, for their Complaint against defendant Meta Platforms, Inc., d/b/a Facebook and d/b/a Instagram ("*Defendant*" or "*Meta*") state and allege as follows:

## INTRODUCTION

1. This action seeks to recover damages for copyright infringement under the Copyright Act, 17 U.S.C. §101 *et seq*.

2. Plaintiffs (or the LLC Plaintiffs' founding members) each create their own videos of severe weather events all over the world.

3. Plaintiffs own the rights to and license their respective videos for various uses including online and print publications.

4. Meta owns and operates a website at www.facebook.com ("*Facebook*").

5. Meta owns and operates a website at www.instagram.com ("*Instagram*") (Facebook and Instagram are collectively referred to as the "*Websites*").

6. Meta permits third parties to create accounts on Facebook and Instagram ("*Users*").

7. Upon information and belief, Meta is registered as an online service provider with the United States Copyright Office (the "*USCO*") pursuant to 17 U.S.C. §512.

8. Section 512 contains limitations on liability referred to as "safe harbors" for internet service providers ("*ISP*").

9. According to the USCO, the safe harbors under Section 512 shield qualifying ISPs from monetary liability for copyright infringement based on the actions of their users, in exchange for cooperating with copyright owners to expeditiously remove infringing content and meeting certain conditions.

10. To qualify for the Digital Millennium Copyright Act ("*DMCA*") safe harbors, an ISP must (1) adopt and reasonably implement a qualifying repeat infringer policy, and (2) accommodate and not interfere with standard technical measures. 17 U.S.C. § 512(i).

11. Further, to qualify for the DMCA safe harbors, an ISP:

A. must not have actual knowledge that the material or an activity using the material on its system or network is infringing (17 U.S.C. § 512(c)(1)(A));

B. must not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity (17 U.S.C. § 512(c)(1)(B)); and

C. upon notification of a claimed infringement via a compliant DMCA take-down notice, it must also respond expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity (17 U.S.C. § 512(c)(1)(C)).

12. Pursuant to 17 U.S.C. § 512, Meta has copyright policies and guidelines in place which advise copyright owners how to send DMCA take-down requests to Meta.

13. Meta allows certain creators and businesses to protect their content on Facebook and Instagram using Meta Rights Manager, a copyright management tool.

14. Meta states on its website that Rights Manager can be used to establish content

ownership by uploading reference files.

15. Meta describes a reference file as "an audio, image, or video file that you own the rights to or are authorized to enforce the rights on behalf of the owner".

16. When content is uploaded to Rights Manager, Meta automatically scans the content against other Users' uploaded content and identifies any matches.

17. If Meta Rights Manager identifies a match, the match is assigned a "match id" and appears in the "Matching content" tab in the User's Rights Manager.

18. When a creator requests matched content to be taken down, a copyright report is submitted to Meta with a request to remove the content and multiple pieces of content can be reported at once using Rights Manager.

19. The copyright report (complaint) is assigned an identification number.

20. In connection with this action, hundreds of Facebook and Instagram Users copied and displayed numerous videos owned by Plaintiffs on the Users' respective Facebook and/or Instagram accounts, without permission or authorization from Plaintiffs (these Users are referred to herein as the "*Infringing Users*").

21. Plaintiffs monitor their videos using Meta Rights Manager.

22. Plaintiffs collectively submitted hundreds of thousands of copyright take-down requests to Meta over the past few years.

23. In connection with this action, Plaintiffs sent hundreds of DMCA take-down requests pursuant to 17 U.S.C. § 512 in proper form using Meta's DMCA take-down procedures and online submission forms.

24. Despite submitting compliant DMCA take-down requests, Meta, for various improper reasons, failed to take-down the unauthorized uses of Plaintiffs' various works by the Infringing Users.

25. Meta failed to enforce its repeat infringer policies by selectively failing to terminate repeat infringer accounts.

26. Meta failed to accommodate and interfered with the standard technical measures of

its Rights Manager tools relied on by Plaintiffs to their detriment.

27. Specifically, without explanation from Meta, Plaintiffs have been precluded from disputing video conflicts through Rights Manager which has resulted in Plaintiffs' inability to protect their content from Infringing Users' false claims of ownership.

28. Meta, without providing any reasoning, has numerous times incorrectly determined that a conflicting party with millions of followers has "won" a video ownership conflict as to certain videos, which then precludes Plaintiffs from using Rights Manager to locate infringing uses for their copyrighted videos.

29. Further, Meta, without explanation, improperly and arbitrarily terminated access to Plaintiffs' Rights Manager account for "wrongful use of the platform."

30. Meta, without explanation, repeatedly marked Plaintiffs' videos as "Ineligible Content" which prevented Plaintiffs from detecting infringing uses of the videos.

31. Upon information and belief, Meta removed records related to Plaintiffs' take-down requests which prevents Plaintiffs from being able to verify whether Meta actioned the take-down requests.

32. Meta, in failing to comply with its obligations under 17 U.S.C. § 512, does not qualify for the limited liability safe harbors under the DMCA for the infringing acts of its Infringing Users.

33. Meta is therefore liable for the unauthorized reproduction, display and distribution of Plaintiffs' works on Facebook and Instagram, and engaged in this misconduct knowingly and in violation of the United States copyright laws.

**PARTIES**

34. Plaintiff Brown is an individual who is a citizen of the State of Texas who maintains a principal place of business in Carson County, Texas.

35. Brown is an all-weather videographer and photographer who frequently documents tornadoes, hurricanes, blizzards, ice storms, and fires.

36. Plaintiff Beard is an individual who is a citizen of the State of Texas who maintains

a principal place of business in Tarrant County, Texas.

37. Beard is a photo and video journalist who covers weather, fire, police and other breaking news.

38. Plaintiff GWP is a Wyoming limited liability company that maintains a principal place of business in Hutchinson County, Texas.

39. GWP's founding member, Michael Clement ("*Clement*") is an award-winning videographer and FAA-certified drone pilot with nearly 30 years of experience documenting extreme weather events. His work has been licensed by hundreds of media outlets worldwide and featured in major productions, including documentaries on Netflix, HBO, and other prominent platforms.

40. Plaintiff Rigsby is an individual who is a citizen of the State of Colorado and maintains a principal place of business in Adams County, Colorado.

41. Rigsby is a professional storm chaser with over 14 years of experience whose footage has been globally featured by various media companies including ABC, CBS, NBC, CNN, Fox News, Netflix, and the Jennifer Hudson show.

42. Plaintiff BJLP is a Wyoming limited liability company and maintains a principal place of business in Washington County, Arkansas.

43. BJLP's founding member, Ronald Emfinger ("*Emfinger*") is a three-time Emmy Award-winning storm chaser, photojournalist, videographer, and FAA-certified drone pilot with over 25 years of experience documenting extreme weather events. He has captured some of the most iconic and widely recognized footage of natural disasters, including tornadoes, hurricanes, floods, and volcanic eruptions and is regarded as a pioneer in using unmanned aerial systems (UAS) for newsgathering and among the first in the U.S. to deploy drones for real-time storm coverage. In addition to media contributions, he actively assists communities and individuals affected by severe weather by providing damage reports and aerial documentation to support relief and recovery efforts. His footage has been featured by major media outlets including CNN, The New Yorker, FOX Weather, New Scientist, PBS, NBC, ABC, CBS and The Weather Channel.

44. Plaintiff Olson is an individual who is a citizen of the State of Oklahoma who maintains a principal place of business in Cleveland County, Oklahoma.

45. Olson has over 10 years' experience as a videographer and he and his severe weather footage have been featured in documentaries on National Geographic, Discovery Channel, Weather Channel, Netflix, and major media networks.

46. Plaintiff Adair is an individual who is a citizen of the State of Alabama and maintains a principal place of business in Talladega County, Alabama.

47. Adair is meteorologist, storm tracker and videographer with over 14 years' experience and licenses his works to local, national, and international media outlets.

48. Upon information and belief, Meta is a multinational corporation formed in Delaware with a principal place of business and corporate offices at 300 W. Sixth Street, Austin in Travis County, Texas.

## JURISDICTION AND VENUE

49. This Court has subject matter jurisdiction over the federal copyright infringement claims pursuant to 28 U.S.C. §1338(a) and 28 U.S.C. §1331.

50. This Court has personal jurisdiction over Meta because it maintains a principal place of business and corporate offices in Texas.

51. Venue is proper under 28 U.S. Code § 1400 because Meta does business in this Judicial District.

52. Meta is subject to this Court's jurisdiction pursuant to due process and the Texas Long Arm Statute due at least to its substantial business in this State and Judicial District, including (a) at least part of its past infringing activities, (b) regularly doing or soliciting business in Texas, and/or (c) engaging in persistent conduct and/or deriving substantial revenue from goods and services provided to customers in Texas.

## FACTS COMMON TO ALL CLAIMS

### A. Plaintiffs' And Their Copyrighted Works

53. The individual Plaintiffs and the founding members of BJLP and GWP are a group

of talented photo and video journalists who travel around the world documenting extreme weather including tornadoes, hurricanes, flooding, blizzards, volcanoes and the aftermath of those events.

54. Brown, Beard, Clement, Rigsby, Emfinger, Olson and Adair are professional photo and video journalists by trade (each individually referred to as "*Videographer*" or collectively as "*Videographers*").

55. While the Videographers have years of experience monitoring and anticipating weather patterns, their pursuit of this exclusive extreme footage is not without personal risk to their lives and property.

56. Plaintiffs have invested significant time and money in building their respective video portfolios, including but not limited to, costs for travel, and purchase, maintenance and replacement of high-quality video and satellite internet service equipment.

57. Plaintiffs have also invested significant time and money in protecting their content from copyright infringers which requires hours of monitoring digital usage, issuing DMCA take-down notices, responding to counternotices, documenting claims, retaining counsel, along with the time and costs of litigation.

58. Plaintiffs' videos of extreme weather events are frequently copied, downloaded, and reuploaded by infringers due to their quality, exclusivity, subject matter and real-time coverage.

59. Each Plaintiff, separately, is the current legal and rightful owner of the exclusive copyrights, title and interest in thousands of audiovisual works depicting devastating natural disasters and weather events. A non-exhaustive list of videos at issue in this case is annexed as **Exhibit 1** hereto (collectively referred to as the "*Videos*").

60. The Videos are original, creative works and each Plaintiff owns protectable copyright interests in their respective works.

61. Plaintiffs place their works with content licensing agencies and otherwise offer their works for commercial licensing to third-party companies for the purpose of display and public distribution.



SLG SANDERS ·LAW GROUP·

62. In creating each of the Videos listed in **Exhibit 1**, each Videographer personally selected the subject matter, timing, lighting, angle, perspective, depth, lens and camera equipment used to capture their videos and made each and every artistic determination necessary for the creation of the works.

63. Plaintiffs have obtained active and valid copyright registrations from the USCO which cover many of Plaintiffs' works while many others are the subject of pending copyright applications.

64. Each of the Videos listed in **Exhibit 1** have been registered with the USCO. The respective copyright registration numbers for the Videos are set forth in **Exhibit 1** along with the title of the video and the current owner.

65. For GWP's videos, GWP obtained all rights, title and interest in its videos by way of written copyright assignment.

66. For BJLP's videos, BJLP obtained all rights, title and interest in its videos by way of written copyright assignment.

**B. Meta and it's Infringing Activity**

67. Meta is the registered owner of Facebook.

68. Meta is the operator of Facebook.

69. Meta is the registered owner of Instagram.

70. Meta is the operator of Instagram.

71. Facebook is a key component of Meta's popular and lucrative commercial enterprise.

72. Instagram is a key component of Meta's popular and lucrative commercial enterprise.

73. Upon information and belief, Meta is a sophisticated global technology company which owns a comprehensive portfolio of prominent social media platforms and communication services and has advanced operational and strategic expertise in industries where copyright is prevalent.



SLG SANDERS LAW GROUP

74. Upon information and belief, Meta earns revenue in numerous ways, including revenue from selling advertising space on Facebook and Instagram[1].

75. Upon information and belief, Meta collects data on Facebook and Instagram Users' interests, demographics, and activities. Businesses then pay Meta to display targeted ads to specific segments of Users who are most likely to be interested in their products or services.

76. Upon information and belief, Meta's algorithm is designed to prioritize user-posted content that generates more interaction and keeps users on Facebook and Instagram and its other platforms and apps longer.

77. Upon information and belief, the more that Users post and interact with content on the Websites, the more data Meta collects, and the more valuable Meta's advertising space becomes.

78. Meta reported $164.50 billion in revenue in its 2024 Year End Financial Report of which $160.63 billion was from advertising revenue.

79. Meta also reported at the end of 2024 that more than 3.3 billion people use at least one of its apps each day.

80. For the quarter ending June 30, 2025, Meta reported its revenue was $47.52 billion of which $46.56 billion was from advertising revenue.

81. In November 2025, various news outlets such as NBC and Reuters, reported on Meta's leaked internal company documents which show that Meta made billions from scam ads in 2024[2].

82. According to Reuters' report, "On average, one December 2024 document notes, the company shows its platforms' users an estimated 15 billion "higher risk" scam advertisements – those that show clear signs of being fraudulent – every day."

83. Further, "users who click on scam ads are likely to see more of them because of

[1] See https://investor.atmeta.com/financials/.
[2] The Reuters article is located at URL: https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

SLG SANDERS · LAW GROUP ·

Meta's ad-personalization system, which tries to deliver ads based on a user's interests."

84. Sandeep Abraham, a fraud examiner and former Meta safety investigator told Reuters that "[i]f regulators wouldn't tolerate banks profiting from fraud, they shouldn't tolerate it in tech."

85. According to the article, Meta internally projected that it would earn about 10% of its overall annual revenue – or $16 billion – from running advertising for scams and banned goods.

86. Meta spokesman Andy Stone countered that the true number was lower and that Meta "aggressively fight[s] fraud and scams", "reduced user reports of scam ads globally by 58 percent" and "removed more than 134 million pieces of scam ad content."

87. According to Reuters' review of a 2023 document, "Meta also was ignoring the vast majority of user reports of scams."

88. Meta is also selective on which accounts and advertisers would be blocked or taken down depending on their size. According to Reuters, a 2024 document indicates that a "small advertiser would have to get flagged for promoting financial fraud at least eight times before Meta blocked it."

89. According to Reuters, other bigger accounts "known as 'High Value Accounts' – could accrue more than 500 strikes without Meta shutting them down, other documents say."

90. Rather than remove these accounts, Meta instead charged the suspected fraudulent accounts more to advertise on Meta's platforms, offsetting the amount of fraudulent advertising revenue Meta could lose.

91. Meta also fails to comply with its obligations under the DMCA to expeditiously remove infringing content, reasonably implement and enforce a repeat infringer policy, and accommodate and not interfere with standard technical measures of its Websites.

92. According to Facebook's Intellectual Property Help Center and Meta's Community Standards webpage, Meta is committed to helping people and organizations protect their intellectual property rights.

93. Meta's Terms of Service "do not allow posting content that violates someone else's

intellectual property rights, including copyright and trademark."[3]

94. Facebook's Help Center also provides several articles about copyrights including how to protect ones copyrighted works and avoid infringing the copyrights of others.

95. The Help Center also advises that a copyright owner has the right to grant permission to use their copyrighted work as well as the right to prevent or stop other people from using their copyrighted work without permission.

96. Facebook acknowledges it cannot provide legal advice and suggests seeking legal advice on questions about copyright and whether a particular use of a copyrighted work can be considered fair use under United States copyright laws.

97. The Help Center further describes unintentional actions that still can violate copyright on Facebook, including thinking that the use is a fair use and unintentionally profiting from the unauthorized use.

98. Pursuant to Facebook's Help Center and Meta's Terms of Service[4], repeated breaches of Meta's Terms, Policies and Community Standards may result in suspension or permanent disabling or deleting an account, including accounts that repeatedly infringe other people's intellectual property rights.

99. Upon information and belief, Meta's employees and agents have significant experience in intellectual property, copyright matters and the compliance and take-down requirements under the DMCA.

100. Upon receipt of a report of infringement from a rights holder or an authorized representative, Meta states its policy is to remove or restrict content that engages in copyright infringement.

101. Meta further states its policy is to remove accounts that engage in repeated

[3] The Help Center can be accessed at URL: https://www.facebook.com/help/1020633957973118/?helpref=hc_fnav, and the Community Standards regarding intellectual property can be accessed at URL: https://transparency.meta.com/policies/community-standards/intellectual-property/.

[4] See https://mbasic.facebook.com/legal/terms/plain_text_terms/#1.

violations of its Third-Party Intellectual Property Infringement Policy.

102. Upon information and belief, Meta has failed to comply with the take-down requirements under the DMCA and its own intellectual property policies regarding repeat infringers, indicating gross negligence in its legal compliance which is essential for a company with Meta's reach, capabilities, and level of sophistication.

103. Further, Meta violated the DMCA provisions by improperly and arbitrarily determining an Infringing User's use to be fair use and unlawfully refusing to remove the infringing content on that basis.

104. Upon information and belief, Meta's copyright policies are either not strictly enforced or are systematically or selectively ignored, indicating a willful, recurring disregard for copyright compliance.

105. Upon information and belief, a number of copyright lawsuits have been filed against Meta highlighting a pattern of habitual infringement and suggesting Meta has either failed to rectify systemic issues leading to infringements on its platforms or is willfully neglecting intellectual property laws.

106. Meta's failure to effectively enforce its own copyright policies indicates *de facto* willful infringement.

107. According to Meta's Intellectual Property Reports, Meta received over 650,000 copyright take-down reports in December 2022 and over 750,000 reports in May 2023 on Facebook alone[5].

108. The number of copyright reports submitted to Meta in 2023 for Facebook totaled over 4.9 million.

109. The number of copyright reports submitted to Meta in 2023 for Instagram totaled over 2 million.

110. "[T]he staggering scale of infringement makes it more likely that [Meta] condoned

[5] https://transparency.meta.com/reports/intellectual-property/notice-and-takedown/. A single report can identify multiple pieces of content. Reports are not yet available for 2024-2025.



SLG SANDERS · LAW GROUP ·

illegal use, and provides the backdrop against which all of [Meta]'s actions must be assessed." *See Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F.Supp.2d 966, 985 (C.D.Cal. 2006).

111. Meta's reliance on revenue from massive infringing use is further evidence of Meta's unlawful intent. *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S.Ct. 2781-2782, 162 L.Ed.2d 781 (2005).

112. As set forth above, Meta makes money by selling advertising space by directing targeted ads to the screens of Users of their Websites.

113. The more the Websites are used, the more ads are sent out and the greater the advertising revenue becomes.

114. Meta's business model and revenue from advertising turns on high-volume use of the Websites and high User engagement with the content on the Websites, including infringing content.

115. Meta provided the tools necessary for infringement of the Videos via the Websites, yet failed to take simple measures to prevent further damage to copyrighted works. *UMG Recordings, Incorporated v. Grande Communications Networks, L.L.C.*, 118 F.4th 697 (5th Cir. October 9, 2024).

***<u>Meta's Infringement of Brown's Videos</u>***

116. Relevant to this action, valid DMCA take-down notices in accordance with Meta's requirements were transmitted to Meta on behalf of Brown.

117. Meta responded to the notices claiming it had resolved the intellectual property issues in that it had removed or disabled access to the content which was reported for violating Facebook's and/or Instagram's Terms of Service.

118. The Meta copyright report and match ID numbers are included as part of **<u>Exhibit 1</u>** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

119. Contrary to Meta's representations, Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized uses of Brown's video.



SLG SANDERS LAW GROUP

120. Because of its failure to remove or disable the Infringing Users' content, with knowledge of infringement, Meta unlawfully permitted the Infringing Users' continued unauthorized use of Brown's video.

121. Meta has recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of Brown's video.

122. Without permission or authorization from Brown, Meta volitionally permitted the continued reproduction and display of Brown's video.

***<u>Meta's Infringement of Beard's Video</u>***

123. Relevant to this action, a valid DMCA take-down notice in accordance with Meta's requirements was transmitted to Meta on behalf of Beard.

124. Meta responded to the DMCA take-down notice stating it is not able to act on Beard's report because the reported content "is being used for the purpose of commentary, criticism or parody" and does not clearly infringe Beard's copyright.

125. The Meta copyright report and match ID numbers are included as part of **<u>Exhibit 1</u>** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

126. Meta's unlawful refusal to remove the infringing content on its unsanctioned determination of fair use is in direct violation of its obligations under 17 U.S.C. § 512(c).

127. Meta's response email did not provide an explanation or analysis of its impermissible fair use determination.

128. Meta's response email did not provide the name or qualifications of its employee that made its impermissible fair use determination.

129. Meta's response email did not provide Beard with any opportunity to dispute its impermissible fair use determination.

130. Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized use of Beard's video.

131. "Once Noticias", the Infringing User that posted Beard's video, has 1.7 million

followers on Facebook.

132. Because of its failure to remove or disable the Infringing Users' content, Meta unlawfully permitted the Infringing Users' continued unauthorized use of Beard's video.

133. Meta recklessly and willfully contributed to the Infringing User's unauthorized reproduction and display of Beard's video.

134. Without permission or authorization from Beard, Meta volitionally permitted the continued reproduction and display of Beard's video.

***Meta's Infringement of Rigsby's Videos***

135. Relevant to this action, valid DMCA take-down notices in accordance with Meta's requirements were transmitted to Meta on behalf of Rigsby.

136. Meta responded to the notices claiming it had resolved the intellectual property issues in that it had removed or disabled access to the content which was reported for violating Facebook's and/or Instagram's Terms of Service.

137. The Meta copyright report and match ID numbers are included as part of **Exhibit 1** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

138. Contrary to Meta's representations, Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized uses of Rigsby's videos.

139. Because of its failure to remove or disable the Infringing Users' content, with knowledge of infringement, Meta unlawfully permitted the Infringing Users' continued unauthorized use of Rigsby's videos.

140. Meta responded to other DMCA take-down notices stating it is not able to act on Rigsby's report because the reported content "is being used for the purpose of commentary, criticism or parody" and does not clearly infringe Rigsby's copyright. See **Exhibit 1**.

141. Meta's unlawful refusal to remove the infringing content on its unsanctioned determination of fair use is in direct violation of its obligations under 17 U.S.C. § 512(c).

142. Meta's response email did not provide an explanation or analysis of its

impermissible fair use determination.

143. Meta's response email did not provide the name or qualifications of its employee that made its impermissible fair use determination.

144. Meta's response email did not provide Rigsby with any opportunity to dispute its impermissible fair use determination.

145. Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized use of Rigsby's videos.

146. Meta unlawfully permitted the Infringing Users' continued unauthorized use of Rigsby's videos.

147. Many of the Infringing Users of Rigsby's videos have hundreds of thousands of followers.

148. Meta recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of Rigsby's videos.

149. Without permission or authorization from Rigsby, Meta volitionally permitted the continued reproduction and display of Rigsby's videos.

***Meta's Infringement of BJLP's Videos***

150. Relevant to this action, valid DMCA take-down notices in accordance with Meta's requirements were transmitted to Meta on behalf of BJLP.

151. Meta responded to the notices claiming it had resolved the intellectual property issues in that it had removed or disabled access to the content which was reported for violating Facebook's and/or Instagram's Terms of Service.

152. The Meta copyright report and match ID numbers are included as part of **Exhibit 1** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

153. Contrary to Meta's representations, Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized uses of BJLP's videos.

154. Because of its failure to remove or disable the Infringing Users' content, with

knowledge of infringement, Meta unlawfully permitted the Infringing Users' continued unauthorized use of BJLP's videos.

155. Meta responded to other DMCA take-down notices stating it is not able to act on BJLP's report because the reported content "is being used for the purpose of commentary, criticism or parody" and does not clearly infringe BJLP's copyright. See **Exhibit 1**.

156. Meta's unlawful refusal to remove the infringing content on its unsanctioned determination of fair use is in direct violation of its obligations under 17 U.S.C. § 512(c).

157. Meta's response email did not provide an explanation or analysis of its impermissible fair use determination.

158. Meta's response email did not provide the name or qualifications of its employee that made its impermissible fair use determination.

159. Meta's response email did not provide BJLP with any opportunity to dispute its impermissible fair use determination.

160. Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized use of BJLP's videos.

161. Meta unlawfully permitted the Infringing Users' continued unauthorized use of BJLP's videos.

162. Many of the Infringing Users of BJLP's videos have hundreds of thousands of followers.

163. Certain Infringing Users of BJLP's videos have over one million and three million followers.

164. Specifically, Infringing User Canal 10 Nicaragua, has 3.5 million followers and is a repeat infringer, yet Meta has not terminated its account[6].

165. Meta recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of BJLP's videos.

---

[6] https://www.facebook.com/canal10nicaragua/.



SLG SANDERS LAW GROUP

166. Without permission or authorization from BJLP, Meta volitionally permitted the continued reproduction and display of BJLP's videos.

***Meta's Infringement of Olson's Videos***

167. Relevant to this action, valid DMCA take-down notices in accordance with Meta's requirements were transmitted to Meta on behalf of Olson.

168. Meta responded to the notices claiming it had resolved the intellectual property issues in that it had removed or disabled access to the content which was reported for violating Facebook's and/or Instagram's Terms of Service.

169. The Meta copyright report and match ID numbers are included as part of **Exhibit 1** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

170. Contrary to Meta's representations, Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized uses of Olson's videos.

171. Because of its failure to remove or disable the Infringing Users' content, with knowledge of infringement, Meta unlawfully permitted the Infringing Users' continued unauthorized use of Olson's videos.

172. Meta responded to other DMCA take-down notices stating it is not able to act on Olson's report because the reported content "is being used for the purpose of commentary, criticism or parody" and does not clearly infringe Olson's copyright. See **Exhibit 1**.

173. Meta's unlawful refusal to remove the infringing content on its unsanctioned determination of fair use is in direct violation of its obligations under 17 U.S.C. § 512(c).

174. Meta's response email did not provide an explanation or analysis of its impermissible fair use determination.

175. Meta's response email did not provide the name or qualifications of its employee that made its impermissible fair use determination.

176. Meta's response email did not provide Olson with any opportunity to dispute its impermissible fair use determination.



SLG SANDERS LAW GROUP

177. Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized use of Olson's videos.

178. Meta unlawfully permitted the Infringing Users' continued unauthorized use of Olson's videos.

179. Certain Infringing Users of Olson's videos have over one half a million and up to 5.6 million followers.

180. Meta recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of Olson's videos.

181. Without permission or authorization from Olson, Meta volitionally permitted the continued reproduction and display of Olson's video.

***Meta's Infringement of Adair's Video***

182. Relevant to this action, a valid DMCA take-down notice in accordance with Meta's requirements was transmitted to Meta on behalf of Adair.

183. Meta responded to the DMCA take-down notice stating it is not able to act on Adair's report because the reported content "is being used for the purpose of commentary, criticism or parody" and does not clearly infringe Adair's copyright.

184. The Meta copyright report and match ID numbers are included as part of **Exhibit 1** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

185. Meta's unlawful refusal to remove the infringing content on its unsanctioned determination of fair use is in direct violation of its obligations under 17 U.S.C. § 512(c).

186. Meta's response email did not provide an explanation or analysis of its impermissible fair use determination.

187. Meta's response email did not provide the name or qualifications of its employee that made its impermissible fair use determination.

188. Meta's response email did not provide Adair with any opportunity to dispute its impermissible fair use determination.

189. Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized use of Adair's video.

190. Meta unlawfully permitted the Infringing Users' continued unauthorized use of Adair's video.

191. Meta recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of Adair's video.

192. Without permission or authorization from Adair, Meta volitionally permitted the continued reproduction and display of Adair's video.

***Meta's Infringement of GWP's Videos***

193. Relevant to this action, valid DMCA take-down notices in accordance with Meta's requirements were transmitted to Meta on behalf of GWP.

194. Meta responded to the notices claiming it had resolved the intellectual property issues in that it had removed or disabled access to the content which was reported for violating Facebook's and/or Instagram's Terms of Service.

195. The Meta copyright report and match ID numbers are included as part of **Exhibit 1** for purposes of identifying each Infringing User, the specific work infringed, and Meta's response to the relevant DMCA take-down notices.

196. Contrary to Meta's representations, Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized uses of GWP's videos.

197. Despite Meta's identification of a match through Rights Manager, and GWP thereafter sending proper take-down notices via Meta Rights Manager, Meta responded to certain DMCA take-down notices requesting an explanation of how GWP believed the reported content is infringing on its copyright and once additional information was received, Meta would continue to look into the report. The Infringing User in that instance, Bombo Radyo Iloilo, has one million followers and is a repeat infringer, yet Meta has not terminated its account[7].

[7] https://www.facebook.com/bomboiloilo837.



SLG SANDERS LAW GROUP

198. Because of its failure to remove or disable the Infringing Users' content, with knowledge of infringement, Meta unlawfully permitted the Infringing Users' continued unauthorized use of GWP's videos.

199. Meta responded to other DMCA take-down notices stating it is not able to act on GWP's report because the reported content "is being used for the purpose of commentary, criticism or parody" and does not clearly infringe GWP's copyright. See **Exhibit 1**.

200. Meta's unlawful refusal to remove the infringing content on its unsanctioned determination of fair use is in direct violation of its obligations under 17 U.S.C. § 512(c).

201. Meta's response email did not provide an explanation or analysis of its impermissible fair use determination.

202. Meta's response email did not provide the name or qualifications of its employee that made its impermissible fair use determination.

203. Meta's response email did not provide GWP with any opportunity to dispute its impermissible fair use determination.

204. Meta failed to remove or disable the Infringing Users' content despite actual knowledge of the unauthorized use of GWP's videos.

205. Meta unlawfully permitted the Infringing Users' continued unauthorized use of GWP's video.

206. Meta recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of GWP's videos.

207. The Infringing Users of GWP's videos have accounts with a range of followers as high as 36 million followers.

208. In certain instances, Meta temporarily blocked GWP from using the Rights Manager detection tools stating it was "misusing this feature by going too fast."

209. On other occasions, in response to GWP's take-down request, GWP's video was instead removed from Rights Manager.

210. This interference with GWP's use of the Rights Manager detection tools violates

the DMCA.

211. Meta has also responded to GWP's take-down requests questioning GWP's or Clement's rights to the content, without explanation or any apparent counter-notification from the Infringing User.

212. Specifically, Meta stated "We've reviewed your report, and it's not clear that you have rights to the reported content. In particular, it does not appear that you (or your client) created the reported content, or that you are otherwise authorized to submit this report. For this reason, we're unable to act on your report."

213. Meta recklessly and willfully contributed to the Infringing Users' unauthorized reproduction and display of GWP's videos.

214. Without permission or authorization from Plaintiff, Meta volitionally permitted the continued reproduction and display of GWP's videos.

***All Plaintiffs***

215. The Infringements are exact or nearly identical copies of Plaintiffs' Videos or portions thereof that were copied and displayed by Meta.

216. Upon information and belief, each infringement was posted at the direction of a "user", as that term is defined in 17 U.S.C. §512(c).

217. Plaintiffs observed the Infringing Users' unauthorized uses on Facebook and/or Instagram and thereafter sent DMCA take-down notices to Meta using Meta's DMCA take-down procedures.

218. Beginning in July 2024, Plaintiffs discovered Meta's infringing conduct and DMCA violations with regard to the Meta Copyright Report numbers set forth in **Exhibit 1**.

219. Upon information and belief, the Videos were displayed by Meta and its Infringing Users without license or permission, thereby infringing on Plaintiffs' copyrights in and to the Videos.

220. Each Infringement includes a URL ("*Uniform Resource Locator*") for a fixed tangible medium of expression that was sufficiently permanent or stable to permit it to be

communicated for a period of more than a transitory duration and therefore constitutes a specific infringement.

221. Upon information and belief, Meta willfully and volitionally continued to store and display the Videos despite notice of the Infringements.

222. Upon information and belief, Meta was and is aware of the facts or circumstances from which the determination regarding the Infringements was apparent. Meta cannot claim that it was not aware of the infringing activities, including the specific Infringements which form the basis of this complaint, since such a claim would amount to only willful blindness to the Infringements on the part of Meta.

223. Upon information and belief, Meta directly engaged in and contributed to the Infringements knowingly and in violation of applicable United States copyright laws.

224. Upon information and belief, Meta directly monitors and contributes to the content displayed on the Websites by *inter alia*, directly employing a Meta Operations Team to review DMCA take-down requests ("*Employees*").

225. Upon information and belief, Meta Operations Team Employees reviewed Plaintiffs' take-down notices, and in numerous cases made improper, arbitrary fair use determinations in favor of the Infringing Users' unauthorized displays of Plaintiffs' Videos.

226. Upon information and belief, Meta made improper fair use determinations in favor of the Infringing Users even though the Infringing Users did not send DMCA counter-notifications.

227. In doing so, Meta refused to remove the infringing material as required.

228. Upon information and belief, Meta has the legal right and ability to control and limit the infringing activities on its Websites and exercised and/or had the right and ability to exercise such right.

229. Upon information and belief, Meta has received a financial benefit directly attributable to the Infringements.

230. Upon information and belief, Meta continues to receive a financial benefit directly

attributable to the Infringements which Meta has failed to remove.

231. Upon information and belief, the Infringements increased traffic to the Websites and, in turn, caused Meta to realize an increase in its advertising revenues.

232. Upon information and belief, a large number of people have viewed the unlawful copies of the Videos on the Websites.

233. Upon information and belief, Meta at all times had the ability to stop the reproduction and display of Plaintiffs' copyrighted material.

234. Meta's use of the Videos harmed the actual market for the Videos.

235. Meta's use of the Videos, if widespread, would harm Plaintiffs' potential market for the Videos.

236. As a result of Meta's misconduct, Plaintiffs have been substantially harmed.

237. As a result of Meta's misconduct and violations of the DMCA, Meta is not entitled to the "safe harbors" and limitations of liability for the infringing actions of its Infringing Users provided under 17 U.S.C. §512.

## FIRST COUNT

***(Direct Copyright Infringement, 17 U.S.C. §501 et seq.)***
***Meta's Misrepresentations as to Removal***

238. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs, as though set forth in full herein.

239. The Videos are original, creative works in which Plaintiffs own valid copyrights.

240. The Videos are properly registered with the USCO and Plaintiffs have complied with all statutory formalities under the Copyright Act and under regulations published by the USCO.

241. Plaintiffs have not granted Meta nor its Infringing Users a license or the right to use the Videos in any manner, nor have Plaintiffs assigned any of their exclusive rights in the copyrights to Meta or its Infringing Users.

242. Without permission or authorization from Plaintiffs and in willful violation of

Plaintiffs' rights under 17 U.S.C. §106, Meta improperly and illegally reproduced, distributed, and/or publicly displayed works copyrighted by Plaintiffs via its Infringing Users' accounts on the Websites thereby violating one of Plaintiffs' exclusive rights in the Videos.

243. Meta's reproduction of the Videos and display of the Videos on the Websites constitutes willful copyright infringement.

244. Upon information and belief, Meta willfully infringed upon Plaintiffs' copyrighted Videos in violation of Title 17 of the U.S. Code, in that Meta used, published, communicated, posted, publicized, and otherwise held out to the public for commercial benefit, Plaintiffs' original and unique Videos without Plaintiffs' consent or authority.

245. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to an award of actual damages and disgorgement of all of Meta's profits attributable to the infringements as provided by 17 U.S.C. § 504 in an amount to be proven or, in the alternative, at Plaintiffs' election, an award for statutory damages against Meta for each infringement pursuant to 17 U.S.C. § 504(c).

246. As a result of the Meta's violations of Title 17 of the U.S. Code, the court in its discretion may award Plaintiffs the recovery of full costs as well as reasonable attorney's fees and costs pursuant to 17 U.S.C. § 505 from Meta.

247. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to injunctive relief to prevent or restrain infringement of their copyrights pursuant to 17 U.S.C. § 502.

## SECOND COUNT

***(Direct Copyright Infringement, 17 U.S.C. §501 et seq.)***
***Meta's Improper and Baseless Fair Use Determinations***

248. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs, as though set forth in full herein.

249. The Videos are original, creative works in which Plaintiffs own valid copyrights.

250. The Videos are properly registered with the USCO and Plaintiffs have complied

with all statutory formalities under the Copyright Act and under regulations published by the USCO.

251. Plaintiffs have not granted Meta or its Infringing Users a license or the right to use the Videos in any manner, nor have Plaintiffs assigned any of their exclusive rights in the copyrights to Meta or its Infringing Users.

252. Without permission or authorization from Plaintiffs and in willful violation of Plaintiffs' rights under 17 U.S.C. §106, Meta improperly and illegally copied, reproduced, distributed, and/or publicly displayed works copyrighted by Plaintiffs via its Infringing Users' accounts on the Websites thereby violating one of Plaintiffs' exclusive rights in the Videos.

253. Meta's reproduction of the Videos and display of the Videos on the Websites constitutes willful copyright infringement.

254. Upon information and belief, Meta willfully infringed upon Plaintiffs' copyrighted Videos in violation of Title 17 of the U.S. Code, in that Meta used, published, communicated, posted, publicized, and otherwise held out to the public for commercial benefit, Plaintiffs' original and unique Videos without Plaintiffs' consent or authority.

255. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to an award of actual damages and disgorgement of all of Meta's profits attributable to the infringements as provided by 17 U.S.C. § 504 in an amount to be proven or, in the alternative, at Plaintiffs' election, an award for statutory damages against Meta for each infringement pursuant to 17 U.S.C. § 504(c).

256. As a result of Meta's violations of Title 17 of the U.S. Code, the court in its discretion may award Plaintiffs the recovery of full costs as well as reasonable attorney's fees and costs pursuant to 17 U.S.C. § 505 from Meta.

257. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to injunctive relief to prevent or restrain infringement of their copyrights pursuant to 17 U.S.C. § 502.

**THIRD COUNT**



SLG SANDERS LAW GROUP

***(Contributory Copyright Infringement)***

258. Plaintiffs repeat and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs, as though set forth in full herein.

259. Meta herein has caused, enabled, facilitated and materially contributed to the Infringements via its Infringing Users' accounts on the Websites.

260. Meta has directly and indirectly promoted the Infringements and refused to exercise its ability and obligation to stop the Infringements of its Infringing Users.

261. Meta has a continuing relationship with the Infringing Users by failing to take down and continuing to display the Infringements, by providing them with continuous access to the Websites and the ability to earn revenue on the Infringements

262. Thus, Meta's actions substantially contributed to the infringing activity.

263. Upon information and belief, many, if not all of the Infringing Users accounts are monetized, and Meta earns revenue from the content posted to these accounts.

264. Meta's actions show a relationship to the infringing activity beyond just mere operation of an internet business. For instance, Meta was sent valid DMCA take-down notices regarding the Infringements, Meta's employees reviewed the take-down requests, and thereafter either made a determination to remove the Infringements and falsely claimed to do so, or made an improper fair use determination and failed to remove the Infringements.

265. Meta is liable as a contributory infringer since it had actual knowledge of another's infringing conduct and induced, caused and/or materially contributed to that conduct.

266. Meta's conduct and contributory infringement is and has been willful, intentional, purposeful, and in disregard of the rights of Plaintiffs, and has caused substantial damage to Plaintiffs.

267. Upon information and belief, Meta willfully contributorily infringed upon Plaintiffs' copyrighted Videos in violation of Title 17 of the U.S. Code.

268. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to an award of actual damages and disgorgement of all of Meta's profits attributable to the

SIG SANDERS · LAW GROUP ·

infringements as provided by 17 U.S.C. § 504(b) in an amount to be proven or, in the alternative, at Plaintiffs' election, an award for statutory damages against Meta for each infringement pursuant to 17 U.S.C. § 504(c).

269. As a result of the Meta's violations of Title 17 of the U.S. Code, the court in its discretion may award Plaintiffs the recovery of full costs as well as reasonable attorney's fees and costs pursuant to 17 U.S.C. § 505 from Meta.

270. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to injunctive relief to prevent or restrain infringement of their copyrights pursuant to 17 U.S.C. § 502.

## FOURTH COUNT
### *(Vicarious Copyright Infringement)*

271. Plaintiffs repeat and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs, as though set forth in full herein.

272. Upon information and belief, at all material times hereto, Meta had the right, ability and obligation as an ISP to expeditiously remove infringing content from its Websites, maintain and enforce a repeat infringer policy, and not interfere with standard technical measures relating to its Rights Manager copyright management tool.

273. Upon information and belief, at all material times hereto, Meta further had the right, ability and obligation to control the conduct of its Employees, Agents, Affiliates, Vendors and/or Users and declined to exercise the right and ability to supervise or control that infringing conduct despite its legal right to stop or limit the directly infringing conduct as well as the practicable ability to do so.

274. As a direct and proximate result of such refusal to exercise its right to stop or limit the infringing conduct, Meta has continued to infringe upon Plaintiffs' Videos, which in turn generates revenue for Meta directly from the Infringements.

275. Meta enjoyed a direct financial benefit from the Infringements from *inter alia*, advertising revenue from the increased traffic to its Websites and from the increase in fees paid by

advertisers and sponsors.

276. Upon information and belief, Meta enjoyed a directed financial benefit from using the appeal or "draw" of Plaintiffs Videos to increase user traffic to the Websites, thereby increasing advertising revenue.

277. Meta is liable as a vicarious infringer since it profited from the Infringements while declining to exercise a right to stop or limit it.

278. Upon information and belief, Meta willfully vicariously infringed upon Plaintiffs' copyrighted Videos in violation of Title 17 of the U.S. Code.

279. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to an award of actual damages and disgorgement of all of Meta's profits attributable to the Infringements as provided by 17 U.S.C. § 504(b) in an amount to be proven or, in the alternative, at Plaintiffs' election, an award for statutory damages against Meta for each work infringed pursuant to 17 U.S.C. § 504(c).

280. As a result of the Meta's violations of Title 17 of the U.S. Code, the court in its discretion may award Plaintiffs the recovery of their reasonable attorney's fees and costs pursuant to 17 U.S.C. § 505.

281. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to injunctive relief to prevent or restrain infringement of their copyrights pursuant to 17 U.S.C. § 502.

## FIFTH COUNT

***(Inducement of Copyright Infringement)***

282. Plaintiffs repeat and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs, as though set forth in full herein.

283. Meta took affirmative steps to encourage and/or foster infringement.

284. Meta encouraged infringement by failing to take down Infringing Users' infringing posts which Meta falsely confirmed it removed.

285. Meta encouraged infringement by failing to take down Infringing Users' infringing

posts which Meta arbitrarily determined were fair use.

286. Meta encouraged infringement by failing to terminate repeat Infringing Users' accounts.

287. Meta encouraged infringement by interfering with standard technical measures such as its Right Manager tool by blocking detection of infringing uses, removing information and matched content from Plaintiffs' Rights Manager, and removing Plaintiffs' access to Rights Manager, among other things.

288. Users of the Websites have been provided with the means and mechanisms through such Websites to directly infringe and are directly infringing Plaintiff's copyrights, by, for example, creating unauthorized reproductions of Plaintiff's copyrighted works and distributing copies of such works in violation of Plaintiff's exclusive rights under 17 U.S.C. §§ 106 and 501.

289. Meta has induced and continues to induce infringement by, for example, providing technology on the Websites to share and monetize infringing content and/or by failing to block or diminish access to infringing material even though there are technological means to do so that are available and known to Meta.

290. Meta's infringing conduct is and has been willful and in disregard of the rights of Plaintiffs and has caused substantial damage to Plaintiffs.

291. Upon information and belief, Meta willfully induced and infringed upon Plaintiffs' copyrighted Videos in violation of Title 17 of the U.S. Code, in that it used, posted, publicized, and otherwise displayed to the public for commercial benefit Plaintiff's original and unique Videos without Plaintiff's consent or authority, by using the Videos on the Websites.

292. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to an award of actual damages and disgorgement of all of Meta's profits attributable to the Infringement as provided by 17 U.S.C. § 504(b) in an amount to be proven or, in the alternative, at Plaintiffs' election, an award for statutory damages against Meta for each work infringed pursuant to 17 U.S.C. § 504(c).

293. As a result of Meta's violations of Title 17 of the U.S. Code, the court in its



SLG SANDERS LAW GROUP

discretion may award Plaintiffs the recovery of reasonable attorney's fees and costs pursuant to 17 U.S.C. § 505.

294. As a result of Meta's violations of Title 17 of the U.S. Code, Plaintiffs are entitled to injunctive relief to prevent or restrain infringement of their copyrights pursuant to 17 U.S.C. § 502.

## SIXTH COUNT
***(Class Allegations)***

295. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), on behalf of the following class:

> All individual persons or entities who, owning the exclusive right to publicly perform, reproduce, publicly display, or distribute film, audiovisual, or photographs and/or videos over the Internet, whose registered copyrighted work(s) have been uploaded to Facebook or Instagram, and who properly notified Meta pursuant to the DMCA (17 U.S.C. 512) of the infringing use of their work by a third-party that was being stored and displayed on Facebook or Instagram, and were advised by Meta that it would not remove or disable the infringing usage due its internal determination that the infringing use does not infringe on their copyright because it is being used for the purpose of commentary, criticism or parody (i.e. fair use) ("Class"); and who received from Meta such notice declining to remove infringing content based on its determination of fair use within three years prior to the filing of the complaint to the present ("Class Period"). Excluded from the Class are: (a) any person or entity who is a partner, officer, director, employee, or controlling person of Meta; (b) any entity in which Meta has a controlling interest; and (c) the legal representatives, heirs, successors, and assigns of any excluded party. Plaintiffs reserve the right to amend the Class definition if further investigation and/or discovery reveal that the Class should be expanded, divided into subclasses, or otherwise modified. Pursuant to Federal Rules of Civil Procedure 23(a)(1), the members of the Class are so numerous that joinder of all members is impracticable. The exact number of Plaintiff class members is presently unknown but is reasonably ascertainable applying objective criteria. The number of Class members is anticipated to be potentially many thousands.

296. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), there are questions of law or fact common to the Class members. The claims of the Plaintiffs and the members of the Class arise from the uniform method by which Meta improperly and impermissibly reviewed and acted upon DMCA take-down notices. The claims of the Plaintiffs and the Class members arise from a common federal statute and legal theory and a common nucleus of operative facts which

are applicable to the claims of each Class member. This liability question may be decided by one Court. The common questions of law and fact include, but are not limited to:

a. Whether Meta's conduct as alleged constitutes direct infringement of the copyrights held by Plaintiffs and the Class in their respective works.

b. Whether Meta's conduct as alleged constitutes contributory copyright infringement of the copyrights held by Plaintiffs and the members of the Class.

b. Whether Meta's conduct as alleged constitutes vicarious copyright infringement of the copyrights held by Plaintiffs and the members of the Class.

c. Whether Meta's conduct as alleged constitutes inducement of copyright infringement of the copyrights held by Plaintiffs and the members of the Class.

d. Whether Meta acted willfully with respect to the copyright infringements alleged.

e. Whether Meta has reasonably implemented a policy and procedure to prevent infringements of the copyrights held by Plaintiffs and the members of the Class on Facebook and Instagram

f. Whether Plaintiffs and the members of the Class have sustained injury and, if so, what is the proper measure of relief.

297. Pursuant to Federal Rule of Civil Procedure 23(a), Plaintiffs' claims are typical of the claims of the other members of the Class since Plaintiffs and all members of the Class were deprived of the statutory compensation for the use of their copyrighted works.

298. Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class and have retained counsel experienced in federal copyright law matters and class action lawsuits.

299. Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the injury suffered by individual Class members may be relatively small, and the expense and burden of individual litigation would therefore make it impossible and/or impracticable for members of

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

300. Certification of Plaintiffs' claims for class action treatment is also appropriate pursuant to Federal Rules of Civil Procedure 23(b)(2) because Meta has acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Class in failing to comply with its obligations under the DMCA and refusing to compensate Plaintiffs and Class members for the unlawful use and reproduction of their copyrighted works. Meta's records reflect the identities of the Class members whose copyrighted materials have been posted on its platforms and notified Meta pursuant to the DMCA; and to whom Meta responded with a refusal to remove the infringing content. As a result, Plaintiffs seek to represent an ascertainable Class, in that determining membership in the Class can be accomplished through access to Meta's own records.

## JURY DEMAND

301. Plaintiffs hereby demand a trial of this action by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a judgment finding that Meta has infringed on Plaintiffs' rights to the Videos in violation of 17 U.S.C. §501 *et seq.* and therefore award damages and monetary relief as follows:

a. Determining that this action may be maintained and certified as a class action pursuant to Federal Rule of Civil Procedure 23 and certifying Plaintiffs as the representatives and their undersigned counsel as counsel for the Class.

b. Finding that Meta infringed Plaintiffs' and the Class' copyright interests;

c. Awarding Plaintiffs and the Class damages derived from the infringing acts, and/or statutory damages, in the amount permitted by law with respect to each work infringed, including statutory damages for willful and/or reckless misconduct.

d. Granting Plaintiffs and the Class injunctive and other equitable relief enjoining Meta, its officers, agents, servants, and employees, and all those acting in concert with the aforementioned parties:



SLG SANDERS LAW GROUP

i. From directly or indirectly reproducing, publicly performing, publicly displaying, or distributing the copyrighted works to which Plaintiffs and the Class have exclusive rights.

ii. From causing, contributing to, inducing, enabling, facilitating, or participating in the infringement of any of the copyrighted works which are the property of the Plaintiffs and the Class members.

iii. From continuing to claim the right to make a fair use determination in response to a valid DMCA take-down notice;

e. Awarding Plaintiffs and the Class the costs of litigation and reasonable attorney's fees pursuant to 17 U.S.C. § 505;

f. Awarding pre-judgment interest as permitted by law; and

g. Awarding any other relief the Court deems just and proper.

DATED: January 12, 2026

**SANDERS LAW GROUP**

By: *__/s/ Craig B. Sanders__*

Craig B. Sanders, Esq.
Renee J. Aragona, Esq.
333 Earle Ovington Blvd, Suite 402
Uniondale, NY 11553
Tel: (516) 203-7600
Email: csanders@sanderslaw.group
Email: raragona@sanderslaw.group
File No.: 132314
*Attorneys for Plaintiff*